**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STEVEN LARSON, individually and on behalf of all others similarly situated, | |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| v. | |
| FLUIDMASTER, INC., | |
| Defendant. | |

| This Document Relates to: | |
|---|---|
| In re: FLUIDMASTER, INC., WATER CONNECTOR COMPONENTS PRODUCTS LIABILITY LITIGATION | MDL No. 2575<br><br>The Honorable Robert M. Dow, Jr. |

## CLASS ACTION COMPLAINT

Plaintiff, Steven Larson, by and through their undersigned counsel, individually and on behalf of all others similarly situated, alleges:

## NATURE OF THE ACTION

1.      This action seeks to redress the latent defects in Fluidmaster, Inc.'s ("Fluidmaster") "NO BURST" Toilet Connectors with acetal coupling nuts ("Toilet Connector"). Fluidmaster couches itself as a world leader in toilet repair and plumbing products.  During the relevant period, Fluidmaster designed, manufactured, distributed, and sold flexible Toilet Connectors.  To permit water flow into the toilet tank, a Toilet Connector connects the water fixture shut-off valve to the base of the toilet using a plastic coupling nut.  These plastic coupling nuts are uniformly defective in their design and labeling.  As a result, the Toilet Connector poses a substantial risk of failure by permitting the unrestricted flow of water into the home causing damage to property.

CLASS ACTION COMPLAINT                              1

2.      Fluidmaster knew, and has known, about the defects with its Toilet Connectors and that they were prone to failure following routine installation. Fluidmaster also knew, and has known, that as early as 2003, a mechanically and financially feasible, safer alternative design for the Toilet Connector that presented no adverse consequences to the product or to the consumer was available in the marketplace. Rather than replace these defective Toilet Connectors, Fluidmaster concealed and suppressed its knowledge of these defects, exposing Plaintiff and the putative Classes to a substantial risk of significant property damage.

3.      Fluidmaster has now remediated many of the defects with its Toilet Connectors complained of herein, including a wholesale change of the plastic material.  Fluidmaster, however, *never* notified Plaintiff and the members of the putative Classes that a remediated product was available.  Instead, Fluidmaster left Plaintiff and the putative Classes exposed to the risk of catastrophic water damage by the defective product, while it slipped its remediated Toilet Connectors into the market undetected.

4.      Plaintiff and the putative Classes have suffered, and will continue to suffer, injury-in-fact and lose money as a direct result of Fluidmaster's conduct.  Each putative Class Member has paid for a defective Toilet Connector when they otherwise would not have, or will be caused to expend money to replace the defective Toilet Connectors once these defects are publicly known.

5.      The central issue raised herein – whether Fluidmaster's Toilet Connectors are defective – is common to the members of the putative Classes. There is an economy to class treatment of this central question because its resolution has the potential to eliminate the need for continuing, repeated litigation related to the Toilet Connectors' alleged defects and the reasons for its repeated failure.

## **JURISDICTION**

6.      This Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1332(d), as the matter is brought as a class action under Rule 23 of the Federal Rules of Civil Procedure, and the sum of the amount in controversy exceeds $5,000,000.  The requirement of minimal diversity is met as the dispute is between citizens of different states.  *See* 28 U.S.C. § 1332(d)(2)(A).

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because, on December 10, 2014, the Judicial Panel on Multidistrict Litigation assigned all pending litigation related to the defects with Fluidmaster "NO-BURST" flexible connectors to this district.

**PARTIES**

**Plaintiff:**

8.      Plaintiff, Steven Larson, is a resident of Edina, Minnesota.  Mr. Larson purchased two "NO-BURST" Fluidmaster supply lines for his home based on the 10-year warranty offered. Mr. Larson has come to learn that the product suffers from inherent defects and does not conform to the terms of the warranty, providing that the Toilet Connector is free from defect in both workmanship and/or materials.



9.      Defendant, Fluidmaster, Inc. is a California corporation headquartered at 30800 Rancho Viejo Road, San Juan Capistrano, California. At all relevant times, Fluidmaster was actively involved in designing, manufacturing, assembling, marketing, distributing, and selling Toilet Connectors from the State of California throughout the United States, Europe, Asia, Australia, and the Americas.

**FACTUAL ALLEGATIONS**

10.      Defendant Fluidmaster designed, manufactured, assembled, tested, labeled and offered for distribution and/or sale defective Toilet Connectors with the specific intention and purpose that these defective Toilet Connectors be installed by builders, plumbers, and consumers alike in homes, commercial properties, and other dwellings throughout the United States.  In doing so, Fluidmaster represented that the Toilet Connectors were of superior engineering and heavy-duty craftsmanship when in reality they contained latent defects.

CLASS ACTION COMPLAINT                          3

11.    Fluidmaster knowingly failed to publicly disclose that its Toilet Connectors were defective, unsafe and posed a substantial risk of failure resulting in damage to property.

12.    The Toilet Connector designed, manufactured, assembled, tested, labeled, marketed, distributed and sold by Fluidmaster connects a water fixture shut-off valve to a toilet. Prior to the introduction of these Toilet Connectors, the connection between a water shut-off valve and a toilet required a hard pipe connection. A section of rigid metal tubing would be cut to the appropriate length with metal coupling assemblies on both ends of the tubing to connect the property's water shut-off valve to the toilet.

13.    Toilet Connectors eliminated the need for the customized cut necessary to fasten rigid metal tubing between the shut-off valve and toilet. Toilet Connectors were manufactured in a variety of lengths (6" – 20") and made available for sale, at large, to builders, plumbers, and consumers through home do-it-yourself centers such as Home Depot or Lowes. They retailed anywhere from $3 to $7.



Fluidmaster Toilet Connector with Plastic Coupling Nut

14.    Initially, when first introduced to the market, the coupling assemblies on both ends of the Toilet Connector were made of metal. The metal couplings connected to both the water shut-off valve and the toilet. These metal nuts were not susceptible to fracture.

15.    Due to the cost associated with the materials for, and manufacture of, the metal nut, Fluidmaster replaced the toilet attachment end with a cheaper acetal plastic coupling nut sometime in the late 1980s. Fluidmaster's plastic design, however, is more akin to a metal design, which fails to account for the material and behavioral differences of plastic.

16.     Fluidmaster promoted the plastic coupling nut on its Toilet Connectors as "heavy duty" and "durable and easy to grip" for installation.  Between 2001- 2004, Fluidmaster offered a 10-year warranty for its connectors, and touted it as "the longest warranty available." Fluidmaster also claimed that the plastic coupling nut could "withstand 12-ft-lbs of installation torque."

17.     However, as early as October 2000, Fluidmaster realized that the plastic coupling nuts were failing long before their guaranteed 10-year warranty period.  As a result, sometime in approximately September 2004, Fluidmaster ceased offering the 10-year warranty.  Despite the internal decision to remove the 10-year warranty (and acknowledgement that the connectors fail long before 10-years), thousands of the connectors remained stocked on store shelves across the United States, including those that caused damage to Plaintiff.

18.     Despite its claims of "durability" and "heavy-duty" craftsmanship, Fluidmaster faced *more than* 1,600 documented claims related to the nearly identical failure of the plastic coupling nut on its Toilet Connectors resulting in more than $48 million in known property damages.  Repeatedly, the plastic coupling would suffer the same circumferential fracture causing water damage to property.   (*See* Figure 1).

## Figure 1

  

19.     These repeated, circumferential fractures of the plastic nut are the direct result of the defective design and labeling of the Toilet Connector.  The Toilet Connector's plastic coupling nut fail to adhere to the most basic design standards in the plastics industry.

20.     When using plastics to manufacture and design parts, the plastics industry recognizes that a proper design strategy will include, at minimum: (a) a concern for safety and performance; (b) appropriate material selection and a mold design optimized for the chosen material to achieve the functional design goal; (c) maximum functionality; and (d) optimum material usage.

21.     Unlike metals, every plastic design, "must incorporate the estimated creep behavior of a particular [plastic] resin under the load and environmental conditions [the part is] expected" to be placed in.  DuPont, *Delrin Acetal Resin Design Guide – Module III*, at 21. Failure to do so is a breach of the most basic design duties.

**Fluidmaster's Design Fails to Account for "Creep" in Plastic**

22.     "Creep" is an engineering term used to describe the continued deformation or extension of a plastic component that is under a continuous load.  Most people have seen examples of creep in their everyday lives, be it through plastic fence gates that sag over time due to creep of the hinge material, plastic washers that permanently flatten and change shape over time under compression loads, or polymer ropes that stretch over time when used to support heavy objects.  Creep occurs in all engineering materials, including metals, plastics, and ceramics, but plastics respond to long term loads differently than metals or ceramics.

23.     Under stress, polymer molecules in plastics seek to relieve stress, or relax. If the stresses are small and a plastic component is exposed to stress for only a short period of time, the component will deflect and rebound without suffering any long term damage.

24.     If, however, stresses are sufficiently large (*e.g.,* tightening or torqueing to avoid water leaks) and long term stresses exist (*e.g.*, constant pressure resulting from tightening and compression), the plastic molecules inside a plastic part will creep in an effort to relieve stress and relax.  Over time, and with constant pressure, the plastic material will microscopically experience "crazing."

CLASS ACTION COMPLAINT                    6

25.     "Crazing" or crazes are like fine, thin, tiny type cracks that extend in a plastic part on or under the surface. Crazes are initiated when the external stretch of the plastic material causes a microscopic void to open up at a stress concentration point created by a notch in the material.

26.     After the void is opened, the microscopic void will spread in a plane perpendicular to the highest principal stress.  When the component's design can no longer withstand the constant pressure – and achieve sufficient relaxation – the crazing will transition to a crack and failure occurs. This type of failure is termed "creep rupture."

27.     Creep is so fundamentally relevant to plastic product design that the creep behavior of materials is taught in the most basic engineering courses dealing with materials science, failure analysis, fracture mechanics, polymer physics and product design.

28.     As discussed below, Fluidmaster's design for its plastic coupling nut failed to account for the creep behavior of the plastic material under a load.  That design failure coupled with the internal localized stress created by sharp stress concentrators in the thread design of the plastic nut, concentrates a large stress load into a small area, imparting significant localized stress into the surrounding polymer material.  This flawed design invariably leads to crazing as the plastic seeks to relax under the load.

29.     Because the stress applied to the nut remains essentially constant during its attachment to the underside of the toilet, the existing microscopic crazes continue to grow and new crazes continue to form in a perpendicular plane as the part seeks to relax.  As the crazes progressively link in the perpendicular plane, a nearly identical circumferential crack is formed within the wall of the nut.



**Figure 2**
**(Exemplar Image of Plastic Coupling Nut Depicting Circumferential Crack from Creep Rupture)**

30.     Once the crack in the sidewall forms, the remaining material then experiences instantaneous fracture, and water begins to spray from the fractured nut.  Often, the fractured nut completely separates into two pieces as seen in Figure 3 below.



**Figure 3**
**(Fluidmaster Fractured Coupling Nut)**

31.     Fluidmaster's design failed to account for the plastic material's "estimated creep behavior… under the load and environmental conditions" that the nut would regularly be placed into by the design defect of a notch, and resulting stress concentration.  DuPont, *Delrin Acetal Resin Design Guide – Module III*, at 21

32.     In fact, Fluidmaster's toilet nut design is particularly susceptible to creep and creep rupture due to design defects.  These design defects result in detrimentally high stress

concentrations in a localized area, in a notch-sensitive material that does not readily relieve stress without ultimate fracture.  These defects could have been easily avoided.

**Improper Material Selection – A "Notch" Sensitive Polymer**

33.     Fluidmaster used "acetal" for the coupling nut's material. Acetal is widely accepted as a notch sensitive polymer that is prone to failure due to stress concentration.  In other words, Fluidmaster selected a plastic material for the coupling nut that is particularly susceptible to creep and creep rupture when the design contains sharp corners (notches) and is placed under a constant load.

34.      Fluidmaster's selection of "acetal" for the plastic nut, and the inclusion of a notch in the thread design, essentially ensured that creep, and ultimately, rupture would occur.

35.     In particular, Fluidmaster's design failed to account for the "notch sensitivity" of the acetal.  Notch sensitivity is commonly understood to mean the extent to which the sensitivity of a material to fracture is increased by the presence of a notch or stress concentrator.

36.     It is widely recognized by the plastic industry, that, when designing with plastic, sharp corners are to be avoided. A sharp corner augments localized stresses and creates a preferential site for crack initiation by multiplying stresses where cracking can more easily occur.  *See* DuPont Delrin acetal resin Modeling Guide, *Technical Information* at 21 ("A sharp corner in a [plastic] part acts as a notch and initiates break at a very low energy.").  A basic example of a stress concentrator – or notch - is the small groove found at the top of a fast-food ketchup packet.  The notch in the packet creates a stress concentrator in the material, allowing it to be opened.

37.     Sharp corners are the principal cause of plastic part failure because they produce localized stress or stress concentration.  Instead, when molding plastics, corners should be rounded to reduce stress.

CLASS ACTION COMPLAINT                    9



**Figure 4:**
**(Effect of Load on Sharp Corners)**

38.     As early as 1988, GE Plastics, in a published design guide, warned manufacturers that, "the presence of sharp corners is perhaps the greatest single cause of part failure. Minimizing sharp corners reduces stress concentration and results in parts with greater structural strength.  Because [plastic] resins are notch sensitive materials, fillets and radii should be included at all internal corners to reduce the effect of stress concentration."  GE Plastics, *VALOX Resin Design Guide* (June 1988).  This means that internal corners should be rounded, not sharp.

39.     Fluidmaster's plastic coupling nut has threading cut into its sidewall that allows the nut to affix to the toilet's base.  The transition of the threading to the base of the coupling nut contains a sharp transition points, or notch, which concentrate stress.



40.     Fluidmaster's plastic coupling nut design combined a notch sensitive plastic (acetal), and abrupt transition points, creating a perfect storm of defects.  These defects cause the plastic to creep extensively due to stress concentration following routine installation, which

ultimately leads to the nearly identical circumferential fracture. (*See* Figure 1).

41.     Despite extensive instruction to the contrary from the plastics industry found in off-the-shelf design and material guides, as well as Fluidmaster's knowledge that repeated coupling nut failures were being reported each year, Fluidmaster continued to manufacture the defective coupling nut. The defects caused the coupling nut to repeatedly fracture in near uniform fashion after routine installation.

42.     Fluidmaster's defectively designed Toilet Connectors remain both in homes and stocked on store shelves throughout the United States, and they will ultimately fail due to creep and creep rupture before the expiration of the 10-year warranty.

**Inadequate Labeling & Warnings**

43.     Fluidmaster had a duty to not only adequately design the plastic coupling to withstand the foreseeable pressure and torque during routine installation, but also to provide detailed instructions for installation, together with warnings against the possibility of failure.

44.     The labels affixed to Fluidmaster's Toilet Connectors contain similar, incomplete instructions for tightening the plastic coupling nut, including "Tighten ½ turn beyond hand tight," "HAND TIGHTEN ONLY," and "**DO NOT OVERTIGHTEN.**"

45.     These instructions, however, provide *no* actual direction on how much torque can safely be applied to the plastic coupling nut without over-stressing the parts. These vague, confusing instructions require that the installer guess as to how much torque is "just enough" to hold the nut in place so that it will not leak, while failing to warn of the nut's propensity to fracture due to the notches resident in the coupling nut's design.

46.     By 2007, Fluidmaster had internally concluded that *at least* 390 plastic coupling nut failures were caused by "over-tightening" the nut during routine installation. Over-tightening exacerbates the defective design that causes the coupling nut to fail. Therefore, at least by 2007, Fluidmaster had noticed that its installation instructions and warnings were vague, ambiguous, and defective contributing to the repeated failure of its coupling nuts. *See USAA Casualty Ins. Co., v. Fluidmaster, Inc*. Case No. 06-CC-10212.

47.     The Toilet Connector's label also fails to identify the risks and hazards associated

with over-tightening the coupling nut. The label does not warn about: the specific nature of the risks (i.e., spontaneous fracture), the gravity of the risks (i.e., flooding), or how to avoid those risks (i.e., replacement of defective Toilet Connector).

48.  Without proper installation instructions or warnings about the potential for the plastic nut to fracture and fail, Plaintiff and the Class members were left on their own to determine whether the plastic nut was properly affixed to the toilet; and if, or when, it should be replaced while affixed to a toilet, which pursuant to Fluidmaster's own warranty should have been a minimum of 10 years.

49.  Fluidmaster abused its access to information and superior knowledge of the defects associated with the Toilet Connector's plastic coupling, and it exploited the Plaintiff' ignorance of those defects and the likelihood that the Toilet Connector would fail and result in substantial property damage.

**Fluidmaster's "Code Approvals" and "Certifications" Do Not Support the  Sufficiency of the Coupling's Design**

50.  Fluidmaster advertised on its website that its Toilet Connectors were "code approved" and "exceed[ed] all plumbing code requirements," including those imposed by IAMPO and ASME. However, none of these approvals has any meaningful application to the plastic coupling nut.

51.  IAMPO stands for the "The International Association of Plumbing and Mechanical Officials" which coordinates the development and adaptation of plumbing codes to meet the specific needs of individual jurisdictions both in the United States and abroad. IAPMO develops and publishes the Uniform Plumbing Code (UPC).

52.  IAMPO does not do any testing and does not provide any certification for the plastic coupling nuts. Specifically, IAMPO does not have codes or standards designating the appropriate material to be used for the plastic coupling *or* how much torque the coupling nut should be able to withstand. The IAMPO certification is wholly irrelevant as it relates to the sufficiency of the design of the plastic coupling nut.

53.  Similarly, ASME stands for the "American Society of Mechanical Engineers," which is a professional association that develops codes and standards for mechanical engineers.

54.     Just like IAMPO, ASME does not provide any certification for the plastic coupling nut design nor does it have any standards related to a plastic coupling's ability to withstand stress during routine installation.  The ASME's standards are wholly irrelevant as it relates to the sufficiency of the design of the plastic coupling nut.

**Fluidmaster Changed the Toilet Connector Design to Remedy the Defects**

55.     Fluidmaster knew that its plastic coupling nut contained excessive preventable dangers. Specifically, Fluidmaster knew that the coupling nut was susceptible to creep rupture and that the installation instructions and warnings failed to provide the installer with sufficient information to safely install the Toilet Connector and/or timely replace it before it failed.

56.     Despite its knowledge, Fluidmaster never provided any public warnings about the risk of the Toilet Connector's failure.  Fluidmaster also never instituted a recall to inspect, repair, or replace the knowingly defective Toilet Connectors.  As a result, homes and buildings throughout the United States are exposed to, and continue to suffer, catastrophic water damage due to the failure of Fluidmaster defective Toilet Connectors.

57.     Instead of notifying consumers of these defects, Fluidmaster reduced the toilet connectors' warranty life from 10 to 5 years, and then began to re-designing the Toilet Connector.  At some point in 2012, Fluidmaster began to market and sell a new, reinforced Toilet Connector.

58.     Fluidmaster's re-designed Toilet Connector replaced the defective coupling nut's notch sensitive acetal with a glass filled polypropylene. Glass reinforced polypropylene provides high strength, high stiffness and excellent impact behavior.  The use of glass reinforced polypropylene for toilet coupling nuts had been common in plastic plumbing parts as early as 2003.

CLASS ACTION COMPLAINT                    13

**Figure 6**

 

| **DEFECTIVE DESIGN** | **REMEDIATED DESIGN** |

59.     Fluidmaster remediated the defects of its defective coupling nut and placed the re-designed nut into the market.  Fluidmaster however never publicized the fact that the nut was redesigned.  Fluidmaster also did not recall the defectively designed nuts from its distribution networks, nor did it notify property owners that the defective nut could spontaneously fail and should be replaced.

60.     Thus, at all times material hereto, and prior to the times when Plaintiff suffered damage, Fluidmaster knew that: (a) the risk of the Toilet Connector plastic coupling nut's failure was substantial; (b) Plaintiff and the Classes were unaware of the substantial risk that the Toilet Connector plastic coupling nut would fail; (c) Plaintiff and the Classes had a reasonable expectation that Fluidmaster would disclose the risk and cure the defects; and (d) Plaintiff and the Classes were unaware that their Toilet Connectors should be replaced or that they had a useful life shorter than their stated warranty period.

**Plaintiff and the Classes Have Been Damaged**

61.     Plaintiff and the Classes have suffered actual harm as a result of Fluidmaster's actions because the Toilet Connectors in their homes contain defects and inadequate labeling that have caused and/or could cause the plastic coupling nut to fracture, leak water and damage property.

62.     Plaintiff and the Classes had a reasonable expectation that the service life of the Toilet Connectors would exceed 10-years, as stated by the Fluidmaster warranty, and paid more for the Fluidmaster Toilet Connector than they otherwise would have due to the promise of the "the longest warranty available."

63.     Moreover, at all times material hereto, a mechanically and financially feasible, safer alternative design existed that presented no adverse consequences to the product or to the consumer. Indeed, as early as 2003, other toilet connector manufactures remediated their designs to address all of the design flaws outlined herein, including switching from notch sensitive acetal, to a stronger glass filled polypropylene.[1]

64.     The injuries sustained by Plaintiff and the Classes flow from common facts surrounding Fluidmaster's misconduct, including: (1) the Toilet Connector had defects that cause it to fracture before its warranty period expires; (2) the Toilet Connectors contain an excessive preventable danger which could lead to catastrophic water damage to property; (3) Fluidmaster did not provide adequate instruction for installation or warnings urging periodic replacement; (4) Fluidmaster, despite knowing about the Toilet Connectors' defects, failed to provide any public notice or warning about the defective coupling nut design or institute a recall to repair or replace the defective Toilet Connectors; (5) a mechanically and financially feasible, safer design alternative existed as early as 2003 that contained no adverse consequences to the product or the consumer; and (6) Fluidmaster knowingly re-designed the Toilet Connectors and placed them in the market undetected in order to actively conceal the defects of the earlier design.

65.     The damages suffered by Plaintiff and the Classes include, without limitation, amounts paid for the defective Toilet Connectors in excess of what they otherwise would have paid, together with the cost to replace the defective Toilet Connectors.

---

[1]     On September 9, 2003, one of Fluidmaster's principal competitors, Brass-craft Manufacturing Company, obtained a patent for a re-designed coupling nut for its toilet connectors. The Brass-Craft design cured many of the defects outlined herein, including switching to a 30% glass-filled polypropylene. (US D479, 585 S). And by July 2009, Watts Water Technologies, the largest distributor of toilet connectors, introduced a similar remediated design to the United States market replacing acetal with a glass filled polypropylene.

CLASS ACTION COMPLAINT                    15

**Active Concealment / Equitable Tolling**

66.     The inherent defects in the plastic coupling nuts are not perceptible to Plaintiff or other Class members until the coupling nut ultimately fractures and causes water leaks and property damage.  Even after water begins leaking into the property, homeowners cannot determine the nature of the defect without expert assistance.

67.     Because of the facts alleged in the preceding paragraphs, Plaintiff and the Classes did not become aware of the defects with the Toilet Connectors until they suffered damages from its failure.

68.     In addition, Fluidmaster is estopped from asserting a statute of limitations defense because Fluidmaster failed to disclose facts that it was obligated to disclose concerning the defects in its Toilet Connectors, Fluidmaster actively concealed and misrepresented to Plaintiff and the Classes facts which were essential to understanding that Plaintiff and the Classes had claims against Fluidmaster, and Fluidmaster otherwise acted so as to prevent Plaintiff and the Classes from learning that they possessed claims against Fluidmaster.  Had Plaintiff and the Classes been aware of the facts which Fluidmaster misrepresented and concealed, they would have commenced suit against Fluidmaster before the running of any statute of limitations alleged to be applicable to this case.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings all his claims as class claims pursuant to Fed. R. Civ. P. 23.  The requirements of Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) are met with respect to the Classes defined below.

70.     A Rule 23(b)(2) Class is appropriate when the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

71.     Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (3d ed. 1998).

72.     Fluidmaster's failure to warn or acknowledge that its Toilet Connector with a plastic coupling nut contains latent defects that cause fracture resulting in extensive  property damage, as well as their failure to notify Plaintiff and the Classes about the remediation to the defective Toilet Connector, makes declaratory relief with respect to a Rule 23(b)(2) class appropriate.

73.     The Rule 23(b)(2) "Equitable Relief Class" is defined as follows:

> All persons in the United States who own and/or reside in a structure that contains a Fluidmaster toilet connector with an acetal coupling nut.

74.     Plaintiff propose a Rule 23(b)(3) "Damages Class" defined as follows:

> All persons in the United States who purchased a Fluidmaster toilet connector with an acetal coupling nut

75.     Alternatively, Plaintiff proposes a State of Minnesota Rule 23(b)(3)  sub-class defined as:

> All persons in the State of Minnesota who purchased a Fluidmaster toilet connector with an acetal coupling nut

76.     Excluded from the Classes are Defendant Fluidmaster, any entities in which Fluidmaster has a controlling interest, any of its  parents, subsidiaries, affiliates, officers, directors, employees and members of such person's immediate families, the presiding judge(s) in this case and his/her immediate family, and any class member who has entered into a binding release for their claim with Fluidmaster and/or is barred from bringing a claim due to a judgment entered in a court of law pursuant to the doctrines of res judicata and/or collateral estoppel.

77.     The Classes expressly disclaim any recovery for physical injury caused by a Toilet Connector's coupling nut failure.

**RULE 23(a), (b)(2), and (b)(3) CRITERIA**:

78.     <u>Numerosity</u>:  Plaintiff is informed and believes that Fluidmaster sold millions of defective Toilet Connectors throughout the United States during the Class Period.  The Classes consist of hundreds, if not thousands of persons, making individual joinder of all the Class members impracticable.  The Classes can be readily identified; Fluidmaster's Toilet Connectors

can be identified by unique markings on the Toilet Connector itself, together with the labeling affixed to each connector.

79.     <u>Commonality</u>:  Questions of law and fact are common to the Plaintiff, the Equitable Relief Class and the Damages Class, and they predominate over questions affecting only individual members.  Common questions include:

        (a)     Whether the Toilet Connectors plastic coupling nut is defective;

        (b)     Whether the Toilet Connector label provides adequate instruction for its installation, its useful life, its warranty, as well as adequate warnings regarding its propensity to fail;

        (c)     Whether Fluidmaster owed Plaintiff and the Classes a duty to warn about the Toilet Connectors' defects;

        (d)     Whether Fluidmaster's design contemplated and compensated for routine torque applied during installation;

        (e)     Whether Fluidmaster remediated the defective Toilet Connector without notifying Plaintiff and the Class members;

        (f)     Whether Fluidmaster continued to sell the defective Toilet Connector after remediating its design; and

        (g)     Whether Plaintiff and members of the Damages Class are entitled to damages.

80.     <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the Classes described above, and they arise from the same course of conduct by Fluidmaster.  The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

81.     <u>Adequacy</u>:  Plaintiff will fairly and adequately represent and protect the interests of all absent Class members.  Plaintiff is represented by counsel competent and experienced in consumer protection, products liability, and class action litigation.  Plaintiff's counsel also served as lead class counsel in an identical action brought against Watts Water Technologies for defects with its plastic coupling nut.  That action resulted in a $23 million class-wide settlement which received final court approval on July 18, 2014.  *Trabakoolas v. Watts Water Tech., Inc.*, Case No. 2012-cv-01172 (N.D. Cal).

82. <u>The Prerequisites of Rule 23(b)(2) are Satisfied for an Equitable Relief Class</u>: The prerequisites to maintaining a class action for declaratory and equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) exist since Fluidmaster has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and equitable relief with respect to the Class as a whole. The central issues of whether Fluidmaster's Toilet Connectors are defective and whether the installation instructions were inadequate is the same for all Class members. There is an economy to class treatment of those central questions because their resolution has the potential to eliminate the need for continued and repeated litigation across the country related to the Toilet Connector's alleged defects and the reasons for its repeated failure.

83. <u>The Prerequisites of Rule 23(b)(3), Predominance and Superiority, are Satisfied for the Damages Class:</u> Plaintiff and the Class have all suffered damages as a result of the Fluidmaster's defective Toilet Connector's plastic coupling nut. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Moreover, absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

84. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Fluidmaster. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

85. Fluidmaster's actions are generally applicable to the Classes as a whole, and Plaintiff seek, *inter alia*, equitable remedies on behalf of a (b)(2) class and damages on behalf of (b)(3) classes.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*
### On behalf of the Rule 23(b)(2) Equitable Relief Class

86.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

87.     Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (3d ed. 1998).

88.     There is an actual controversy between Fluidmaster and Plaintiff concerning: (1) whether Fluidmaster's Toilet Connectors with plastic coupling nut have are defective, which causes the plastic coupling nut to fracture; (2) whether Fluidmaster knew, or should have known, of this defective design; (3) whether the instructions provided by Fluidmaster for installation of the Toilet Connector were inadequate; (4) whether Fluidmaster failed to adequately warn against over-tightening the plastic coupling nut; and (5) whether Fluidmaster knowingly remediated the defects before Plaintiff sustained any damage and without notice to Plaintiff and the Declaratory Relief Class about the defects, and the potential for the Toilet Connectors to fail as a result of the defects.

89.     Pursuant to 28 U.S.C. § 2201 this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

90.     Despite the repeated failures since their introduction, Fluidmaster refused to acknowledge that its Toilet Connector with plastic coupling nuts were defectively designed and that their labels failed to adequately instruct how to safely and properly install the coupling nuts in order to avoid failure and property damage. Fluidmaster remediated the defective design and revised the label's instructions without advising consumers, and it continued to sell the defective Toilet Connectors with their inadequate labels across the country.

91.     Accordingly, because of Fluidmaster's failure to act, Plaintiff seeks a declaration that the Toilet Connectors with plastic coupling nuts are defective in their design, material and

labeling.  These defects will cause the plastic coupling to fracture resulting in water damage to property.  The defective nature of the plastic coupling nut is material and requires disclosure to all persons who reside in a structure that contains Fluidmaster's defective Toilet Connectors with plastic couplings.

92.     The declaratory relief requested herein will generate common answers that will settle the controversy related to the alleged defective design and labeling of the Toilet Connectors with plastic coupling nuts and the reasons for their repeated failure.  There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

**SECOND CAUSE OF ACTION**
**Breach of Implied Warranty**
**On Behalf of a Rule 23(b)(3) Damages Class**

93.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

94.     Plaintiff asserts a claim for violations of Implied Warranty of Merchantability on behalf of himself and all other similarly situated consumers pursuant to Cal. Civ. Code § 1791.1.

95.     Fluidmaster sells its Toilet Connectors through a network of authorized dealers that are not the intended beneficiaries of the express or implied warranties associated with the Toilet Connectors.

96.     Plaintiff and the proposed Class are the ultimate consumers and intended end-users of the Toilet Connectors.

97.     By operation of law, Fluidmaster impliedly warranted to Plaintiff and the Class that the Toilet Connectors were of merchantable quality, adequately contained, packaged, and labeled, conform to the promises or affirmations of fact made on the label, and fit for the ordinary purposes for which the Toilet Connectors were intended to be used.

98.     Fluidmaster knew or had reason to know at the time of sale that the Toilet Connectors were required for a particular purpose (supplying and containing water for a toilet), and that Plaintiff and Class members were relying on Fluidmaster' skill or judgment to select or furnish such goods.

99.     Plaintiff and the members of the Class also believed that if they were required to replace Fluidmaster's Toilet Connector prior to the stated 10-year warranty period Fluidmaster would have instructed them to do so.

100.    Fluidmaster breached their implied warranties when they failed to provide Toilet Connectors that were fit for their ordinary purpose; conformed to the promises or affirmations of fact made on the label; and failed to include the necessary instructions for safe and proper installation as well as when to replace the Toilet Connectors and the actual useful life of the Toilet Connectors.

101.    The latent design defects and the defects associated with the Toilet Connectors were not discoverable by Plaintiff and the Class.  In fact, the label indicated just the opposite – the Toilet Connectors would last at least 10-years.

102.    As a direct and proximate result of Fluidmaster's breach of the implied warranty, Plaintiff and the Class members have incurred damages in the amount of costs incurred to purchase the defective Toilet Connector.

### THIRD CAUSE OF ACTION
**Breach of Express Warranty**
**On Behalf of a Rule 23(b)(3) Damages Class**

103.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

104.    Plaintiff asserts this claim for breach of express warranty on behalf of himself and the Class members.

105.    Fluidmaster expressly represented and warranted to Plaintiff and the Class members by and through oral and written statements, descriptions, and affirmations of fact in product advertisements, marketing materials, its web site, and other written materials intended for the general public, that the Toilet Connector was safe and fit for its proper and intended uses for up to 10-years, and that the Toilet Connector contained no defects in material or workmanship.

106.    Fluidmaster expressly represented and warranted the Toilet Connector against defects in material or workmanship during the 10-year period and that Fluidmaster would

"replace any part of this plumbing product which proves to be defective in workmanship or materials under normal use for 10 years from the date of purchase."

107.    Fluidmaster publicized these statements to Toilet Connector buyers, and understood that the nature of their warranty and the quality of their design and workmanship were unavoidably material to all Plaintiff and the Class members.

108.    These express warranties related to and covered qualities and features of the Toilet Connectors that were unavoidably material to Plaintiff and the Class members.

109.    Plaintiff and the Class members relied upon these express warranties in purchasing their Toilet Connectors.

110.    At the time they made these express warranties, Fluidmaster knew the purposes for which the Toilet Connectors were intended to be used, and warranted the Toilet Connectors as safe and fit for such purposes.

111.    At the time they made these express warranties, Fluidmaster knew that the Toilet Connectors did not conform to its express representations, because they contained latent defects in their design, material and workmanship.  Fluidmaster nevertheless continued to market Toilet Connectors by means of false and misleading information, including that they would last for up to 10-years, without regard to their actual fitness.

112.    The Toilet Connectors purchased by Plaintiff and the Class members did not conform to Fluidmaster's promises, descriptions, or affirmations of fact, because they are not free from defects in materials and/or design.  The Toilet Connector contains a defective coupling nut design that is substantially certain to fracture due to the notch sensitivity of the plastic coupling nut and the presence of a notch or stress concentrator at the end of the thread.  As a result, the Toilet Connector frequently failed, causing water leaks and property damage during the warranty period entirely disproportionate to the age of the Toilet Connector.

113.    Fracture of the coupling nut from the stress concentration at the notch occurs gradually.  Due to the difficult to reach location of the Toilet Connector and the inability to visually see creep taking place in the coupling nuts, most Toilet Connector owners did not learn

about the defective coupling nut design or its effects until they experienced a Toilet Connector failure and water leaks.

114.    Due to the nature of the defective coupling nut design, the date on which a Toilet Connector owner discovers his or her coupling nut fracture has little bearing on when the fracture occurred.  The product was defective at the time of sale.  Further, as discussed above, any complete coupling nut fracture occurring after the expiration of Fluidmaster's warranty period necessarily began within the warranty period because the deterioration of the defective coupling nut due to creep and craze formation, starts at installation.

115.    The coupling nut defect can be readily cured by replacing the Toilet Connector with one that contains a remediated coupling nut.

116.    Plaintiff and the Class members have incurred damages as described herein as a direct and proximate result of Fluidmaster's misrepresentations in its express warranty.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf all others similarly situated, respectfully requests  that this Court enter a judgment against Fluidmaster and in favor of Plaintiff, and grant the following relief:

A.    Determine that this action may be maintained as a Class action with respect to the Classes identified herein; certify a class action pursuant to both Rule 23(b)(2) and (3) with respect to particular issues if appropriate; and designate and appoint the named Plaintiff herein and their counsel to serve as Class Representatives and Class Counsel;

B.    Grant Plaintiff and the Equitable Relief Class members, pursuant to Rule 23(b)(2), declaratory, equitable, and/or injunctive relief and require Fluidmaster to stop the unlawful, unfair and deceptive conduct alleged herein and/or notify the Equitable Relief Class members about the Toilet Connector defect at Fluidmaster's expense, and to replace all defective Toilet Connectors;

C.    Grant Plaintiff and the Rule 23(b)(3) Classes awards of damages in such amount to be determined at trial or as provided by applicable law;

D.      Grant Plaintiff and the members of the Classes their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

E.      Grant Plaintiff and the members of the Classes such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMAND

Plaintiff, by his counsel, request a trial by jury on those causes of actions set forth herein.

Date:  December 19, 2014                          Respectfully submitted,


                                                 By:____/s/Daniel J. Kurowski___

Anthony D. Shapiro                               Daniel J. Kurowski
Jeniphr Breckenridge                             **HAGENS BERMAN SOBOL SHAPIRO LLP**
**HAGENS BERMAN SOBOL SHAPIRO LLP**              1144 W. Lake Street
1918 Eighth Avenue, Suite 3300                   Suite 400
Seattle, WA  98101                               Oak Park, IL 60301
Telephone: (206) 623-7292                        Tel. (708) 628-4949
Facsimile: (206) 623-0594                        Fax. (708) 628-4950
tony@hbsslaw.com                                 dank@hbsslaw.com
Jeniphr@hbsslaw.com


Simon Bahne Paris                                Joseph J. Tabacco, Jr. (SBN 75484)
Patrick Howard                                   Todd. A. Seaver (SBN 271067)
Charles J. Kocher                                **BERMAN DEVALERIO**
**SALTZ, MONGELUZZI, BARRETT & BENDESKY, P.C.**  One California Street, Suite 900
One Liberty Place, 52nd Floor                    San Francisco, CA  94111
1650 Market Street                               Telephone: (415) 433-3200
Philadelphia, PA 19103                           Facsimile:  (415) 433-6282
(215) 575-3986                                   Email: jtabacco@bermandevalerio.com
sparis@smbb.com                                  tseaver@bermandevalerio.com
phoward@smbb.com
ckocher@smbb.com


Daniel E. Gustafson
Amanda M. Williams
Raina C. Borrelli
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza120 South Sixth
Street, Suite 2600

CLASS ACTION COMPLAINT                    25

Minneapolis, MN 55402
Tel:     (612) 333-8844
Fax:     (612) 339-6622
dgustafson@gustafsongluek.com
awilliams@gustafsongluek.com
rborrelli@gustafsongluek.com


Donald L. Perelman
Gerard A. Dever
Ria C. Momblanco
**FINE, KAPLAN AND BLACK, P.C.**
One South Broad St., 23rd Floor
Philadelphia, PA  19107
Telephone: (215) 567-6565
Fax: (215) 568-5872
dperelman@finekaplan.com
gdever@finekaplan.com
rmomblanco@finekaplan.com

*Counsel for Plaintiff and the Proposed Classes*